Brett E. Lewis (*pro hac vice*)
brett@iLawco.com
LEWIS & LIN, LLC
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326

*Attorneys for Plaintiff Richard Blair*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Richard Blair,

         Plaintiff,

v.

Automobili Lamborghini S.p.A.,

         Defendant/Counterclaimant.

No. 22-cv-01439-ROS

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    FACTUAL BACKGROUND ....................................................................2

III.   LEGAL STANDARD ...............................................................................4

    A.  Summary Judgment is Inappropriate Where the Nonmovant Submits Factual Evidence Creating Genuine Issues of Material Fact ...............................4

    B.  Standard for Anti-Cybersquatting Consumer Protection Act (ACPA) ...........5

IV.    ARGUMENT...............................................................................................7

    A.  The Undisputed Facts do not Come Close to Satisfying the "Bad Faith" Inquiry under the ACPA.......................................................7

    B.  Lambo is a Widely Used Name and Trademark, not Exclusively Associated with Lamborghini (Factor IX) ........................................8

    C.  "Lambo" is Commonly Used to Identify Blair (Factor II)...................10

    D.  Blair had no intent to divert consumers from Lamborghini (Factor V).........12

    E.  Merely Listing a Domain for Sale Does Not Indicate a Bad Faith Intent to Profit (Factor VI) .......................................................14

    F.  Blair Did Not Provide Misleading Contact Information (Factor VII)............17

    G.  It is Undisputed that Blair Does Not Have a History of Cybersquatting (Factor VIII)..........................................................18

    H.  Totality of the Circumstances Precludes Summary Judgment.....................20

V.     CONCLUSION ........................................................................................21

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Aviva USA Corp. v. Vazirani*, 902 F.Supp.2d 1246 (D. Ariz. 2012) ........................5, 6, 12

*Black v. Irving Materials, Inc.*, 2019 WL 1995342 (N.D. Cal. May 6, 2019)..................15

*Cello Holdings, L.L.C. v. Lawrence-Dahl Companies*, 89 F.Supp.2d 464 (S.D.N.Y. 2000) ......................................................................................................................................19

*CloudCover IP, LLC v. Buchanan*, 2023 WL 35366 (D. Utah Jan. 4, 2023) ......................7

*Collision Chiropractors LLC v. Collision Injury Chiropractic PLLC*, 2022 WL 16793363 (D. Ariz. Nov. 8, 2022)................................................................................5, 17, 21

*Dent v. Lotto Sport Italia S.p.A.*, 2018 WL 11318189 (Feb. 12, 2018).............................9

*Gioconda Law Group PLLC v. Kenzie*, 941 F.Supp.2d 424 (S.D.N.Y.  2013) .............8, 15

*Glock, Inc. v. Global Guns & Hunting, Inc.*, 2015 WL 13614255 (March 30, 2015).........7

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002)..................10

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002)......6, 7, 15, 20

*James v. Burlington Northern Santa Fe Ry. Co.*, 636 F.Supp.2d 961 (D. Ariz. 2007) ................................................................................................................................... passim

*Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) ..............13

*Neeley v. NameMedia, Inc.*, 2011 WL 13180454 (W.D. Ark. June 7, 2011) ...................19

*Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*, 2023 WL 2377641 (N.D. Ga. Feb. 22, 2023) ...............................................................................................................15

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012)....................5, 7

*Ricks v. BMEzine.com, LLC*, 727 F.Supp.2d 936 (D. Nev. 2010)......................................13

*Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 493 F.Supp. 3d 64, 131 (E.D.N.Y. 2020) ...........................................................................................................7, 10, 12

*Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F.Supp.2d 1118 (D. Ariz. 2008) .......5

*Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235 (11th Cir. 2009).................12

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 2013 WL 4528539 (N.D. Cal. Aug. 23, 2013) ................................................................................................................................10

ii

*Top Brand LLC v. Cozy Comfort Co. LLC*, No. CV-21-00597-PHX-SPL, 2023 WL
  5507825 (D. Ariz. Aug. 25, 2023)..................................................................5, 21

*Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527
  F.3d 1045 (10th Cir. 2008) .........................................................................13

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264 (4th Cir. 2001) .................15

*Wagner v. lindawagner.com*, 202 F.Supp.3d 574 (E.D. Va. 2016) ...........................15, 16

### Statutes

15 U.S.C. § 1125(d)(1)(B)(i) .....................................................................................6

15 U.S.C. § 1125(d)(1)(B)(i)(II) .............................................................................10

15 U.S.C. § 1125(d)(1)(B)(i)(VI) ............................................................................14

15 U.S.C. § 1125(d)(1)(B)(i)(VII) ...........................................................................18

15 U.S.C. § 1125(d)(1)(B)(i)(VIII)...........................................................................18

### Other Authorities

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A: 61 (5th ed. 2020)...8,
  10

iii

## I.      INTRODUCTION

Plaintiff/Counterclaim-Defendant Richard Blair ("Blair" or "Plaintiff") submits this Memorandum of Law in Opposition (the "Opposition") to the Motion for Summary Judgment (the "Motion") by Defendant/Counterclaimant Automobili Lamborghini S.p.A. ("Lamborghini" or "Defendant"). Most of the facts alleged by Lamborghini to be undisputed are, in fact, disputed, or, at a minimum, are susceptible to multiple, competing interpretations. At the same time, Lamborghini fails to address manifest evidence establishing the existence of genuine issues of material fact on the question of Plaintiff's alleged bad faith.

This is not close to a case where the material facts are uncontroverted. In discovery, Blair produced evidence demonstrating, *inter alia*, that: (i) "lambo" is a widely used term and surname, not exclusively associated with Lamborghini; (ii) Blair was widely known as "Lambo" long before Lamborghini commenced a proceeding under the Uniform Domain Name Dispute Resolution Policy ("UDRP"); (iii) Blair has a history of registering and developing random character and dictionary-word domain names; (iv) Blair has no history of cybersquatting, (v) Blair has a history of ascribing prices to the domain names he values most in the millions and tens of millions of dollars, and (vi) Blair publicly posted about both his intention to moniker one of his domain names, and that not all of his domain names are really for sale long before the UDRP was filed. Lamborghini completely ignores these uncontroverted facts, and improperly relies on hotly disputed contentions, material omissions, and misrepresentations of fact to support its Motion. Blair did not act with the "bad faith intent to profit" required under the Anti-Cybersquatting Protection Act (the "ACPA"). At a minimum, however, multiple genuine disputes of material fact regarding Blair's lack of "bad faith intent to profit" render summary judgment inappropriate. Accordingly, the Motion must be denied.

1

## II.    FACTUAL BACKGROUND

Blair has invested in domain names since 2009. *See* Plaintiff's Counter-Rule 56.1 Statement ("Pl. Counter R-56.1 Stmt.") ¶ 41. Blair maintains a portfolio of about 130 common dictionary word and random character domain names, some of which he sells, and some of which he develops. Pl. Counter R-56.1 Stmt. ¶¶ 41, 42. Blair acquired the domain name <lambo.com> (the "Domain Name") on February 16, 2018. Pl. Counter R-56.1 Stmt. ¶ 4. Prior to his acquisition of the Domain Name, Blair conducted a search of the term "Lambo," per his usual practice, on different sites, including LinkedIn, OpenCorporates, the USPTO, and DotDB.com. Pl. Counter R-56.1 Stmt. ¶ 30. Blair did not encounter any live trademarks registered to Lamborghini, but he did find many third-party uses of "Lambo" across different industries. Pl. Counter R-56.1 Stmt. ¶ 30. Blair, therefore, concluded that "Lambo" was a common generic term, available for various uses. Pl. Counter R-56.1 Stmt. ¶ 31.

Blair acquired the Domain Name because it was a brandable, pronounceable, single word dot com domain name, which he thought would be a good name to develop. Pl. Counter R-56.1 Stmt. ¶¶ 10, 29. Blair had early plans to develop an active website at <Lambo.com>, and he completed a WordPress installation and a landing page on May 2, 2019. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. Blair subsequently decided to remain focused on developing another website at <ceec.com>, and to resume development of <lambo.com> at a later date. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. <Ceec.com> launched on May 10, 2024. Pl. Counter R-56.1 Stmt. ¶ 14. As Blair develops his websites, himself, he has limited capacity to take on projects. Pl. Counter R-56.1 Stmt. ¶ 14. He plans to build <lambo.com> into a blog and Ceec founder's website once <Ceec.com> reaches certain development milestones. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. Blair's early plans with and development of <lambo.com> have nothing to do with Lamborghini or the automobile industry. *See* Pl. Counter R-56.1 Stmt. ¶ 29.

Despite delayed development of <lambo.com>, Blair adopted "Lambo" as his online moniker as early as October 2019. Pl. Counter R-56.1 Stmt. ¶¶ 9, 10. Blair was

drawn to the name "Lambo" as a play on the word "Lamb," with an outlier generic aptitude and intelligence, hence "Lamb-O." The name resonated with Blair on a personal level, and he thought it perfectly encapsulated his identity and ethos. Pl. Counter R-56.1 Stmt. ¶¶ 37, 38. Blair started to identify himself as "Lambo" and "Lambodotcom" across different Internet platforms, including WhatsApp, Telegram, X.com (formerly Twitter), NamePros.com, and lichess.org. Pl. Counter R-56.1 Stmt. ¶ 9. He has also created an iconography in connection with "Lambo" as a stylized lamb with ***protruding blue brain***, which is consistently used in connection with his online moniker "Lambo," and his perception of himself as a person having *outlier generic aptitude intelligence*. Pl. Counter R-56.1 Stmt. ¶¶ 9, 38.

Years before Lamborghini submitted its complaint to WIPO, on September 17, 2020, Blair identified himself as "Lambo" in a post on NamePros.com, entitled "***I am Lambo***, Q&A Anything with Me" (the "Q&A Post") (emphasis added). Pl. Counter R-56.1 Stmt. ¶ 9. Blair offered to share information about himself and his experiences with domain names, and users under the Q&A Post greeted and recognized Blair as "Lambo." Pl. Counter R-56.1 Stmt. ¶ 9. In this post, Blair even openly stated "***I'm gonna moniker a dotcom of mine, otherwise what kind of domainer would I be?!***" Pl. Counter R-56.1 Stmt. ¶ 9 (emphasis added). Blair is known by the Lambo moniker in the field of domain name investment and development, and, although "Lambo" is not part of Blair's legal name, he is also frequently addressed as "Lambo" among friends and family — including by his father. Pl. Counter R-56.1 Stmt. ¶ 9.

As the Domain Name became more valuable to Blair as an integral part of his identity, he increased the listed price for the Domain Name in order to ***discourage*** people he deemed to be "time wasters" from making offers to purchase it. Pl. Counter R-56.1 Stmt. ¶¶ 15, 26. Blair's lack of interest in selling the Domain Name is corroborated by his past public statements: "Not all my domains are actively for sale really, I do incubate, nurture and build too." Pl. Counter R-56.1 Stmt. ¶¶ 15, 46. Over the years, Blair has received many inquiries expressing interest in purchasing the Domain Name. Pl. Counter

R-56.1 Stmt. ¶¶ 15, 39. However, as further stated below, he has never seriously entertained any offers or attempted to negotiate a sale of the Domain Name. Pl. Counter R-56.1 Stmt. ¶¶ 15, 26, 39.

Blair lists other domain names in his portfolio, which he personally values the most, for as much as $38,996,555. Pl. Counter R-56.1 Stmt. ¶ 49. Blair's domain name portfolio is comprised of short domains with randomized combinations of letters, numbers, and common words and combinations of words. Pl. Counter R-56.1 Stmt. ¶ 43. None of these domain names infringe on known trademarks. Pl. Counter R-56.1 Stmt. ¶ 44. In fact, Blair conscientiously avoids targeting established trademarks before he acquires a domain name. Pl. Counter R-56.1 Stmt. ¶ 45. Blair's domain name portfolio reflects his good faith practices as a domain name investor.

In the fourteen years since Blair entered the domain name industry, he has never before been accused of cybersquatting, been a party to a UDRP proceeding, or been a party to an action under the ACPA. Pl. Counter R-56.1 Stmt. ¶¶ 50-52. His acquisition and use of the Domain Name have nothing to do with Lamborghini, and he never provided any false or misleading information in connection with his use and maintenance of the Domain Name. Pl. Counter R-56.1 Stmt. ¶¶ 29; 53-55. Blair has never offered to sell the Domain Name to Lamborghini. Pl. Counter R-56.1 Stmt. ¶ 33. Nor has Blair used the Domain Name to divert users searching for Lamborghini to a website with pay-per-click ads, or to prevent Lamborghini from representing its trademark in a domain name. Pl. Counter R-56.1 Stmt. ¶¶ 33, 34.

### III.   LEGAL STANDARD

#### A.   Summary Judgment is Inappropriate Where the Nonmovant Submits Factual Evidence Creating Genuine Issues of Material Fact

In evaluating a motion for summary judgment, the court must construe "the alleged facts with all reasonable inferences favoring the nonmoving party." *James v. Burlington Northern Santa Fe Ry. Co.*, 636 F.Supp.2d 961, 965 (D. Ariz. 2007) (citations omitted). "The movant has the initial burden of informing the Court of the basis for its

motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact." *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F.Supp.2d 1118, 1129 (D. Ariz. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). To that end, "[c]onclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment." *James*, 636 F.Supp.2d at 965. If the movant meets its initial burden, "[t]he burden then shifts to the nonmovant to establish the existence of [a genuine issue of] material fact" by "coming forward with specific facts showing that there is a genuine issue for trial." *Aviva USA Corp. v. Vazirani*, 902 F.Supp.2d 1246, 1254 (D. Ariz. 2012) (citations omitted). Moreover, the judge's function at summary judgment "is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial." *Top Brand LLC v. Cozy Comfort Co. LLC*, No. CV-21-00597-PHX-SPL, 2023 WL 5507825, at *3 (D. Ariz. Aug. 25, 2023) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). "If the evidence yields conflicting inferences [regarding material facts], summary judgment is improper." *Collision Chiropractors LLC v. Collision Injury Chiropractic PLLC*, 2022 WL 16793363, at *1 (D. Ariz. Nov. 8, 2022). Accordingly, the Court should deny a motion for summary judgment when "the nonmoving party submits evidence from which a reasonable juror, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *James*, 636 F.Supp.2d at 965.

## B. Standard for Anti-Cybersquatting Consumer Protection Act (ACPA)

A litigant "pursuing a cybersquatting claim under the ACPA must show that: (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1219 (9th Cir. 2012) (internal quotations and citations omitted). A "finding of bad faith is an essential prerequisite to finding an ACPA violation." *Id.* at 1265-66. The ACPA enumerates nine, *non-exhaustive* factors to

consider when determining whether a defendant had a bad faith intent to profit from use of a mark:

> (I)     the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V)    the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII)  the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX)   the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

*Aviva*, 902 F.Supp.2d at 1266 (citing 15 U.S.C. § 1125(d)(1)(B)(i)).

In enacting the ACPA, "Congress did not mean these factors to be an exclusive list." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946–47 (9th Cir. 2002); *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 493 F.Supp. 3d 64, 131 (E.D.N.Y.

2020) ("Courts need not march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive."). Rather "the most important grounds for finding bad faith are *the unique circumstances of the case*, which do not fit neatly into the specific factors enumerated by Congress." *Interstellar Starship Servs.,* 304 F.3d at 946-47. Moreover, "a bad faith intent to profit" under the ACPA is a term of art and "cannot be equated with 'bad faith' in other contexts (such as trademark infringement)." *Shetel Indus.*, 493 F.Supp.3d at 130 (citations omitted). Rather, an ACPA "plaintiff must show that the defendant's use of the domain name is an attempt to profit specifically from 'squatting' on the domain name with bad faith, rather than simply another aspect of the alleged trademark infringement." *Id.*

"[Q]uestions of a party's intent and motive are 'particularly inappropriate for summary judgment disposition.'" *CloudCover IP, LLC v. Buchanan*, 2023 WL 35366, at *8 (D. Utah Jan. 4, 2023) (citations omitted); *Glock, Inc. v. Global Guns & Hunting, Inc.*, 2015 WL 13614255, at *15 (March 30, 2015) (denying summary judgment on ACPA claim and noting that "subjective determinations such as bad faith are singularly inappropriate for determination on summary judgment"); *see also Rearden*, 683 F.3d at 1203 (denying summary judgment on ACPA and trademark claims and noting that "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.").

## IV.   ARGUMENT

### A.  The Undisputed Facts do not Come Close to Satisfying the "Bad Faith" Inquiry under the ACPA

Blair concedes that there is no genuine issue of material fact as to the following matters. Blair is the current registrant of the domain name <lambo.com> (the "Domain Name"). The LAMBORGHINI mark was distinctive prior to both the initial registration of the Domain Name and as of the date that Blair purchased the Domain Name.  Blair also concedes that <lambo.com> is confusingly similar to the LAMBORGHINI mark. *See* Ex. T to Defendant's Rule 56.1 Statement ("Def. R56.1 Stmt.") ¶ 28. However, these

factors, by themselves, fail in any aspect to establish Blair's alleged "bad faith" use of the Domain Name as an attempt to profit by squatting on Lamborghini's famous mark. It is also worth noting that Lamborghini does not raise this legal dispute based on any registered trademark for "Lambo"—in fact, Lamborghini does not own a registration for a Lambo mark in the United States or even use "Lambo" as a trademark. Pl. Counter R-56.1 Stmt. ¶ 35.

As elaborated below, Lamborghini fails to meet the applicable summary judgment standard with respect to the ACPA's "bad faith intent to profit" requirement. A careful consideration of the facts underlying the unique circumstances of the case, in conjunction with the nine statutory "bad faith" factors, makes clear that Blair's acquisition of <lambo.com> is not the type of conduct that the ACPA was enacted to prohibit. *See Gioconda Law Group PLLC v. Kenzie*, 941 F.Supp.2d 424, 432 (S.D.N.Y.  2013) (cautioning against an overly aggressive interpretation of the ACPA and noting that "[t]he ACPA was not enacted to put an end to the sale of all domain names); *see also* 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A: 61 (5th ed. 2020) ("Caution should be exercised, for the mere registration of multiple domain names for resale does not per se mark one as a cybersquatter. One may be in a justifiable business of reserving many domain names"). Summary judgment is, thus, inappropriate because a reasonable factfinder, drawing all inferences in Blair's favor, could find that Blair acquired the Domain Name in good faith and return a verdict for Blair. *James*, 636 F.Supp.2d at 965.

### B.  Lambo is a Widely Used Name and Trademark, not Exclusively Associated with Lamborghini (Factor IX)

The core of Lamborghini's Motion is that Lamborghini, and Lamborghini, alone, is known as "Lambo." Mot. at 6[1]. The argument is that "Lambo" is so tightly woven to

---

[1] Lamborghini relies, in part, on the UDRP panel's finding that "Lambo" is "commonly understood" as "an abbreviation for [Lamborghini]'s vehicles." Mot. at 6. However, "the

8

Lamborghini's identity, and its association in connection with Lamborghini automobiles so well established, that there is no plausible explanation why Mr. Blair registered the Domain Name, other than to target the LAMBORGHINI mark. This argument amounts to gaslighting. In reality, "Lambo" is not exclusively used by the public as a shorthand for Lamborghini – it is not even close to a true statement. The term "Lambo" is used by **hundreds** of non-party businesses in the U.S. and around the world in connection with a vast array of goods and services. *See* Pl. Counter R-56.1 Stmt. ¶ 5. Where a term has common and widespread uses, courts are less likely to infer a bad faith intent to divert customers. *Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 43 F. Supp.3d 1099, 1132 (D. Ore. 2014) (denying summary judgment and crediting "Calista's contention that the phrase 'porn tube' is common and that its use of the word 'porntube' in combination with other arbitrary and suggestive words was merely an attempt to appeal to a consumers' search for adult-entertainment streaming videos on the Internet, as opposed to attempting to divert Tenza's customers").

A search with the term "Lambo" on tmdn.org, a global trademark search engine supported by the European Union Intellectual Property Network, returns thirty (30) live registrations with the single word "Lambo" for products and/or services outside the automobile industry. *See* Pl. Counter R-56.1 Stmt. ¶¶ 5, 6. A search with the same tool returns thirty-one (31) live registrations with the term "Lambo" combined with one other word or design elements. *See* Pl. Counter R-56.1 Stmt. ¶¶ 5, 6. "Lambo" is also a surname. *See* Pl. Counter R-56.1 Stmt. ¶¶ 5, 6. Furthermore, a search of the term "Lambo" on Dun & Bradstreet (dnb.com) returns five hundred and ninety-seven (597) results for companies and business entities from various industries across the world using or incorporating "Lambo" in their names. *See* Pl. Counter R-56.1 Stmt. ¶¶ 5, 6. The commonplace and widespread usage of "Lambo" by hundreds of businesses in a variety

---

WIPO's conclusions are afforded no deference." *Dent v. Lotto Sport Italia S.p.A.*, 2018 WL 11318189, at *3 (Feb. 12, 2018) (Silver, J.) (citations omitted).

of contexts – and multitude of potential available uses – supports Mr. Blair's claim that his registration of the Domain Name had nothing to do with Lamborghini.

Prior to acquiring the Domain Name, Mr. Blair conducted his own due diligence – he searched for "lambo" on LinkedIn, OpenCorporates, the USPTO, and DotDB.com, which is his usual practice. Pl. Counter R-56.1 Stmt. ¶ 30. These searches found many third-party uses of Lambo and several registered trademarks, none of which were registered to Lamborghini. Based on the results of his searches, Mr. Blair concluded that "lambo" was generic and available for various uses across industries. Pl. Counter R-56.1 Stmt. ¶ 31. This factor favors Blair. *Aviva*, 902 F.Supp.2d at 1254.

### C.  "Lambo" is Commonly Used to Identify Blair (Factor II)

The second "bad faith" factor examines "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person." 15 U.S.C. § 1125(d)(1)(B)(i)(II). Notably, Factor II "recognizes that with the growing use of personal web sites, a person should be permitted to register their legal name or widely recognized nickname as the domain name of their web site." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:55 (5th ed. 2020). A domain name owner's use of a domain name consisting of a name that is commonly used to identify him is indicative of an absence of bad faith. *Shetel Indus.*, 493 F.Supp.3d at 131 (noting that the first four "bad faith" factors of the ACPA "suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark.")

Courts will find that Factor II favors the domain name owner where the owner adopts the relevant term as a nickname and is commonly known by that name in multiple, broad contexts. *See SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 2013 WL 4528539, at *23 (N.D. Cal. Aug. 23, 2013) (finding factor II favored owner of domain name containing the term "sunearth" where domain name owner adopted that term as a nickname and was "known throughout China and Europe as 'Sun Earth'"); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234–35 (4th Cir. 2002) (finding that factor

10

II "favored the Domain Names because Harrods BA is commonly known throughout Argentina and South America as 'Harrods'").

Lamborghini improperly represents as an "undisputed fact" that "'Lambo' is not a name 'commonly used to identify [Blair]." To support this misrepresentation, Lamborghini cherry-picks three email communications in which Blair is identified by his legal name, Richard Blair. While Blair goes by his legal name in some contexts, he has also been actively using "Lambo," "Lambo.com," and/or "Lambodotcom" as his moniker, appellation, or *nom de guerre* in multiple online communities including lichess.org, namepros.com, X.com (formally Twitter), WhatsApp, and Telegram (in connection with Mr. Blair's management of <bss.org>). *See* Pl. Counter R-56.1 Stmt. ¶ 9. Other users on X.com and NamePros.com also refer to Mr. Blair as "Lambo." Pl. Counter R-56.1 Stmt. ¶ 9. Blair is also frequently addressed as "Lambo" among friends and family, including his father. Pl. Counter R-56.1 Stmt. ¶ 9.

Significantly, Blair is known by the "Lambo" moniker in the field of domain name investment and development. On September 17, 2020, after Mr. Blair acquired <lambo.com> and years before Defendant submitted its complaint to WIPO, Mr. Blair made a post on namepros.com, titled as "I am Lambo, Q&A Anything with Me" (the "Q&A Post") *See* Pl. Counter R-56.1 Stmt. ¶ 9. In this post, Mr. Blair offered to share information about himself and his experiences with domain names. Users under the Q&A Post greeted and recognized Mr. Blair as "Lambo." Pl. Counter R-56.1 Stmt. ¶ 9. In response to the question "Why lambo name?", Mr. Blair stated "I'm gonna moniker a dotcom of mine, otherwise what kind of domainer would I be?!". Pl. Counter R-56.1 Stmt. ¶ 9. Additionally, Blair has created and consistently used an iconography as a stylized lamb with ***protruding blue brain***, as shown as his profile picture in the Q&A Post, in connection with his online moniker "Lambo" on different Internet platforms. *See* Pl. Counter R-56.1 Stmt. ¶ 9. The protruding blue brain exemplifies how Blair sees his alter ego and himself – as possessing ***outlier generic aptitude and intelligence***. Pl. Counter R-56.1 Stmt. ¶ 38.

11

Though "Lambo" is not part of Blair's *legal* name, Blair's specific evidence shows that he is commonly known as "Lambo" in multiple contexts, including his general online presence, the field of domain name investment and development, public discussions of his experiences with domain names, as well as in personal relationships. Mr. Blair has every right to adopt a nickname or moniker if he so chooses. Given the hundreds of third-party uses of "Lambo," worldwide, and the generic character of the term "Lambo," – Mr. Blair's adoption of "Lambo," a five letter two-syllable term that is both a surname and widely used by businesses around the world, as an appellation should not raise eyebrows.

At a minimum, Blair has presented sufficient, specific evidence to raise a triable issue of fact regarding whether he is commonly known as "Lambo." *Aviva*, 902 F.Supp.2d at 1254. Accordingly, a reasonable factfinder, drawing all reasonable inferences in Blair's favor, could find that Factor II is indicative of Blair's *good faith* in acquiring the Domain Name, *Shetel Indus.*, 493 F.Supp.3d at 131, rendering summary judgment inappropriate. *James*, 636 F.Supp.2d at 965.

## D.  Blair had no intent to divert consumers from Lamborghini (Factor V)

Lamborghini misrepresents the import of Factor V, and the ACPA overall, by contending that Blair "redirected visitors to the <lambo.com> domain to a third-party website where Mr. Blair disparaged Lamborghini's action against him." Mot. at 10. Lamborghini's interpretation of Factor V effectively eliminates the "intent to profit" language found in the ACPA's "bad faith intent to profit" requirement. *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246 (11th Cir. 2009) (explaining that "proving 'bad faith' is not enough" and that liability may only be established where the defendant had a "bad faith *intent to profit*") (emphasis in original). Indeed, Blair's statements that he would "defend, defeat, and humiliate" Lamborghini, made in connection with the UDRP proceedings between the parties, show no "intent to profit" whatsoever on Blair's part.

More importantly, Blair's conduct is not emblematic of the "essence of the wrong" that the ACPA was enacted to combat. For instance, Lamborghini has presented no

12

evidence that Blair has "ever sought to mislead consumers with regard to the site's sponsorship." *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004) (finding an "intent to profit" lacking where ACPA defendant's "web site explicitly stated that the site was established by [defendant] for the purposes of relaying her experience with [plaintiff]"). Nor is there any evidence that Blair obtained any revenue or other pecuniary benefits from traffic on the website located at www.lambo.com. *See, e.g., Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research*, 527 F.3d 1045, 1048 (10th Cir. 2008) (affirming grant of summary judgment for ACPA defendants where there was no evidence, *inter alia*, that defendants intended "to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's"); *cf. Ricks v. BMEzine.com, LLC*, 727 F.Supp.2d 936, 964 (D. Nev. 2010) (finding diversionary intent where the website at the domain name included "pay-per-click" links that produced revenue for the domain owner).

There is simply no evidence suggesting Blair's intent to derive profits or any pecuniary benefits by freeriding on the goodwill in the LAMBORGHINI mark, let alone the fact that the Domain Name is similar to a commonly-known short form of the LAMBORGHINI mark, but not the mark itself. Blair acquired the Domain Name as part of his portfolio with the initial intent to develop it as he has a number of his other domain names. *See* Pl. Counter R-56.1 Stmt. ¶ 36. Though the initial plans of website development were put on hold in lieu of another website project, Blair developed and executed the idea to moniker the domain name. *See* Pl. Counter R-56.1 Stmt. ¶¶ 9, 36, 37 (Blair explicitly stating "I'm gonna moniker a dotcom of mine, otherwise what kind of domainer would I be?!" on Sept. 17, 2020).

Having completed the development of a site for the <ceec.com> domain name, Blair plans to develop the Domain Name into a blog and founder's website for the <Ceec.com> community. *See* Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. Essentially, Blair was

13

drawn to the name "Lambo" as a play on the word "Lamb," with an *outlier generic aptitude and intelligence*, hence "Lamb-O" and the lamb iconography with the bulging blue brain. *See* Pl. Counter R-56.1 Stmt. ¶ 38. Modesty aside, Blair did not use the domain name to divert users searching for Lamborghini to a website with pay-per-click ads, or to prevent Lamborghini from representing its trademark—which is LAMBORGHINI—in a domain name. *See* Pl. Counter R-56.1 Stmt. ¶¶ 33, 34.

As such, Lamborghini has not met its initial burden to demonstrate an absence of a genuine issue of material fact with respect to Factor V. Blair did not register <lambo.com> or create the website thereto with any intent to divert Lamborghini's consumers. Accordingly, the Court should find that this factor weighs heavily in Blair's favor.

### E.  Merely Listing a Domain for Sale Does Not Indicate a Bad Faith Intent to Profit (Factor VI)

Factor VI looks to the domain registrant's "offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or *having an intent to use*, the domain name in the bona fide offering of any goods or services," or the registrant's "prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VI) (emphasis added).  By the statute's own terms, this Factor cannot weigh in favor of a bad faith finding because Mr. Blair has an intent to use the Domain Name. Specifically, Mr. Blair planned to develop <lambo.com> into an active website, and he completed a WordPress installation and a landing page on May 2, 2019. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. He decided to focus on developing another website at <ceec.com> due to limited personal capacity, and to resume development of <lambo.com> at a later date. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. Mr. Blair plans to build <lambo.com> into a blog and Ceec founder's website once <Ceec.com> reaches certain development milestones. Pl. Counter R-56.1 Stmt. ¶¶ 10, 36. Accordingly, Mr. Blair has not engaged in the typical behavior of ACPA violators who

14

seek to sell domain names (that incorporate famous or distinctive trademarks) without using or intending to use them, which is the type of conduct proscribed by Factor VI.

Moreover, the ACPA was not intended to preclude the sale of domain names. *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264 (4th Cir. 2001) (ultimately finding bad faith because Plaintiff never identified itself by the initials "vw"). Merely offering a domain name for sale, on its own, does not weigh in favor of a bad faith finding. *Interstellar Starship Services, Ltd. v. Epix Inc.*, 304 F.3d 936, 947 (9th Cir. 2002); *see also Wagner v. lindawagner.com*, 202 F.Supp.3d 574, 583 (E.D. Va. 2016) (explaining that "legislative history of the ACPA specifically cautions that this factor does not suggest that a court should consider the mere offer to sell a domain name to a mark owner or the failure to use a name in the bona fide offering of goods or services as sufficient to indicate bad faith.").

Lamborghini's argument with respect to Factor VI is that there is only one reasonable interpretation of Blair listing the <lambo.com> domain for sale, and doing so at an astronomically high price. However, Blair's listing was not made with the intent to exact an extortionate price from Lamborghini – the type of conduct that the ACPA was designed to prohibit. *See*, *e.g.*, *Kenzie*, 941 F.Supp. at 437 (noting that "[t]he ACPA is designed principally for cases where a defendant either forces a markholder to purchase a domain name at an extortionate price or diverts customers from the markholder's website to the defendant's own website."). Rather, Blair listed <lambo.com> for sale for an unreasonably high price for precisely the opposite purpose—to discourage prospective purchasers. *See Nu Pagamentos S.A. – Instituicao de Pagamento v. Hudson*, 2023 WL 2377641, at *13 (N.D. Ga. Feb. 22, 2023) (finding genuine dispute of material fact where domain owner "quoted an exorbitant price because he thought himself the rightful owner of the domain and he wanted to make Plaintiff "go away."); *cf. Black v. Irving Materials, Inc.*, 2019 WL 1995342, at *10 (N.D. Cal. May 6, 2019) (finding genuine disputes of material fact where domain name owner disputed trademark holder's interpretation of his offer to sell the domain name and argued that "since he has made bona fide use of the

Domain, he own[ed] that property that it [was] immaterial as to this factor whether or not he ever offered to sell it.").

Further, Blair has attested to the facts that he did not register the domain name with the intent to sell it to Lamborghini, and has never offered to sell the domain name to Lamborghini. Pl. Counter R-56.1 Stmt. ¶ 33. *See Wagner*, 202 F.Supp.3d at 577 (finding noteworthy for bad faith determination that domain owner "never approached plaintiff to sell her the domain name").  As stated above, Blair monikered the Domain Name as one of the dotcom domains he possesses in association with his participation in the domain name industry. *See* Pl. Counter R-56.1 Stmt. ¶ 9. Blair sees the Domain Name as a property of high value to ***himself***, and he listed <lambo.com> for increasingly exorbitant prices to discourage people from making offers to purchase the domain name. *See* Pl. Counter R-56.1 Stmt. ¶¶ 15, 39.  As he explained in the Q&A Post, years before Lamborghini initiated UDRP proceedings against him, "[n]ot all my domains are actively for sale really, I do incubate, nurture and build too." Pl. Counter R-56.1 Stmt. ¶ 15.  Blair received multiple inquiries from third parties, seeking the asking price of <lambo.com>, but he never made any attempt to negotiate a sale price with them. Pl. Counter R-56.1 Stmt. ¶ 15. Instead, he directed them back to the exorbitant price(s) listed at the time for the Domain Name. Pl. Counter R-56.1 Stmt. ¶ 15. Blair increased the price of the Domain Name several times to ***discourage*** people from making offers, as the domain name became more valuable to him as a part of his identity. Pl. Counter R-56.1 Stmt. ¶¶ 15, 39.  Accordingly, Blair did not list <lambo.com> for sale for financial gain, much less to profit off the nickname for Lamborghini's automobiles. Pl. Counter R-56.1 Stmt. ¶ 15.

What's more, Lamborghini misrepresented several pieces of evidence where Blair was *not* entertaining an offer to buy the Domain Name. On January 6, 2021, Blair informed the founder and CEO of Epik, the then-hosting service of the Domain Name,

that the "reserve" price was $888,888.[2] Pl. Counter R-56.1 Stmt. ¶ 24. Blair did not make such statement in response to an offer to buy the Domain Name. Pl. Counter R-56.1 Stmt. ¶ 24. On April 17, 2023, an individual expressed his interest in acquiring the Domain Name without making a specific offer to buy.[3] Pl. Counter R-56.1 Stmt. ¶ 26. The individual stated that the listed price of $50,000,000 was "crazy" and asked what sort of price Blair was looking for. Pl. Counter R-56.1 Stmt. ¶ 26. Blair merely responded with "I understand. Thanks anyway for your interest and best wishes" without negotiating for any price to sell. Pl. Counter R-56.1 Stmt. ¶ 26, and Blair terminated the conversation without further responding to the individual's question of "what's your best price?". Pl. Counter R-56.1 Stmt. ¶ 26. Blair's reactions to such inquiries are in line with his long-time position that "not all of his domain names that are listed for sale are actually for sale." Pl. Counter R-56.1 Stmt. ¶¶ 15, 46.

Although Lamborghini argues that such communications exclusively support a finding of bad faith intent to profit, this is just one possible conclusion that a reasonable factfinder could reach. Blair has presented sufficient, specific evidence from which a reasonable fact finder could conclude that he was not trying to exact an extortionate price from Lamborghini. That Blair listed <lambo.com> for sale at a high price is susceptible to competing, reasonable interpretations, and summary judgment is therefore inappropriate. *Collision Chiropractors*, 2022 WL 16793363, at *1.

### F.  Blair Did Not Provide Misleading Contact Information (Factor VII)

Factor VII considers whether the domain registrant has provided "material and misleading false contact information when applying for the registration of the domain name," the registrant's "intentional failure to maintain accurate contact information," or

---

[2] The price of "888,888", rather than a round number, is not serious on its face.
[3] The quoted statement made by Blair, where he responds that he "would be agreeable to a near all cash offer if ready to close," was meant sarcastically. Pl. Counter R-56.1 Stmt. ¶ 26.

his "prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII).

Lamborghini does not proffer any evidence that would support a finding of Blair's providing false contact information for his acquisition and management of the Domain Name. In fact, Blair did not provide false contact information when acquiring the Domain Name. Pl. Counter R-56.1 Stmt. ¶ 53. He did not fail to maintain accurate contact information, or otherwise exhibit any prior conduct indicating a pattern of such conduct. Pl. Counter R-56.1 Stmt. ¶ 54. What's more, for the times when the Domain Name was directed to an operating website under construction, Blair did not provide any false or misleading contact information on the construction page. Pl. Counter R-56.1 Stmt. ¶ 55. Accordingly, Factor VII weighs against a finding of bad faith, rendering summary judgment against Blair inappropriate.

### G.  It is Undisputed that Blair Does Not Have a History of Cybersquatting (Factor VIII)

Factor VIII examines the "person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

Blair has invested in domain names since 2009 and maintains a portfolio of roughly 130 domain names, a number of which he has developed. *See* Pl. Counter R-56.1 Stmt. ¶¶ 10, 40, 41. Blair's domain name portfolio contains a number of short domain names consisting of a randomized combination of letters or numbers, including, but not limited to <11215.com>, <wywy.com>, <ceec.com>, and <nyip.com>. Pl. Counter R-56.1 Stmt. ¶ 43. He also possesses domain names consisting of combinations of commonly-used words, such as <AsbestosLitigation.com>, <Babywalker.om>, <ComputerCase.com>, <InternetFilter.com>, <CigarRoller.com>, <FlyerDesign.com>, <InvestorList.com>, and <LoveDomains.com>. Pl. Counter R-56.1 Stmt. ¶ 43. Blair

assigns different values to his domain names as he sees fit, and he has different plans for different domain names—whether for sale, for development, or for long-term possession. *See* Pl. Counter R-56.1 Stmt. ¶¶ 41, 42, 43, 47.

Blair acquired the Domain Name as part of his portfolio, because it was a generic, single word dot com domain name, which he thought would be a good name to develop. Pl. Counter R-56.1 Stmt. ¶ 29. It had nothing to do with Lamborghini. Pl. Counter R-56.1 Stmt. ¶ 29. Prior to acquiring the Domain Name, Blair conducted a trademark search, and did not encounter any live marks registered to Lamborghini. *See* Pl. Counter R-56.1 Stmt. ¶ 30. As stated above, he did encounter numerous marks, surnames, and businesses, which comprised or incorporated the term "Lambo." *See* Pl. Counter R-56.1 Stmt. ¶ 30. Based on this search, Blair concluded that "Lambo" was a common term, which is generic and available for various uses across industries. Pl. Counter R-56.1 Stmt. ¶ 31.

Prior to this dispute, Blair has never before been accused of cybersquatting, been a party to a UDRP proceeding, or been a party to an action under the ACPA. Pl. Counter R-56.1 Stmt. ¶¶ 50-52. Blair's lack of a history of cybersquatting is of particular significance because, as set forth above, Blair's domain name portfolio consists of approximately 130 domain names. Many of these are short domain names consisting of a randomized combination of letters or numbers, and combinations of common words. Pl. Counter R-56.1 Stmt. ¶ 43. None of the domain names in Blair's portfolio infringe upon the marks of others. Pl. Counter R-56.1 Stmt. ¶ 44. *See Cello Holdings, L.L.C. v. Lawrence-Dahl Companies*, 89 F.Supp.2d 464, 474 (S.D.N.Y. 2000) (finding disputed issue of material fact where domain owner attempted to register the names of some twenty common nouns); *see also Neeley v. NameMedia, Inc.*, 2011 WL 13180454, at *5 (W.D. Ark. June 7, 2011) (finding no indication of bad faith where domain owner is "in the business of buying and selling domain names" and "[t]he evidence shows that [the domain owner] seeks to profit from such buying and selling, not from the fact that any protectible trademarks are associated with the domain names it trades in."). As evidenced

by his portfolio domains, Mr. Blair does not target trademarked domain names for registration. Pl. Counter R-56.1 Stmt. ¶ 45.

Moreover, though Blair has sold some of his domain names for prices ranging from a few hundred dollars to $500,000, none of those facilitated sales are marginally close to the exorbitant prices of the domain names that Blair does not intend to sell. *See* Pl. Counter R-56.1 Stmt. ¶¶ 46-48. For example, Mr. Blair lists <dnas.com> for sale for $38,996,555, <cryptocorp.com> for $9,679,721, <newsmedia.com> for $4,355,874, <pharmacore.com> for $1,088,969, and <templarcrown.com> for $3,300,000. Pl. Counter R-56.1 Stmt. ¶ 49. None of these high-priced domain names is similar to any famous trademarks or displays a pattern of targeting mark holders. Blair assigns high prices to selective domain names to discourage people from making offers for those domain names. *See* Pl. Counter R-56.1 Stmt. ¶¶ 15, 39. The domain names that are most valuable to Mr. Blair, and which he least wants to sell, receive the highest prices. *See* Pl. Counter R-56.1 Stmt. ¶¶ 15, 39, 49.

Accordingly, the lack of any evidence of a history of cybersquatting, and Blair's history of registering short, randomized combinations of letters or numbers, and generic dictionary word domains, weighs against a finding of bad faith, rendering summary judgment inappropriate. Similarly, Blair's history of developing some of his domain names supports his assertion that he registered the Domain Name with the intent to develop it, and still plans to do so.

### H. Totality of the Circumstances Precludes Summary Judgment

Taking heed of the 9th Circuit's holding in *Interstellar Starship*, 304 F.3d at 946–47, the inquiry in an ACPA case is not a rigid one based on a list of exclusive factors. The facts in each case are unique, and some of the facts discussed above do not lend themselves neatly into a statutory classification. Regardless, the totality of the evidence demonstrates that there are numerous disputed and credible facts, to which the Court must give the non-movant the benefit of the doubt, on a motion for summary judgment. *James*, 636 F.Supp.2d at 965.  Plaintiff has submitted non-conclusory evidence that

"Lambo" is a common term, and that after conducting his own diligence, he understood it to be generic and available for a wide array of potential uses. Plaintiff has submitted non-speculative and corroborated evidence that he intended to moniker one of his domains, and that he adopted "Lambo" as a moniker. Plaintiff has submitted non-speculative and corroborated evidence that he, in, fact, has been known by the appellations, "Lambo," "Lambo.com," and "Lambo dot com" since October 2019 – long before any dispute with Lamborghini. Plaintiff has submitted non-conclusory and corroborated evidence of his interest in registering and developing common, fanciful and generic domain names. Plaintiff has provided a credible and detailed explanation for why he lists certain of his domain names for astronomical prices, and gave context to the email exchanges, which Lamborghini claims to be evidence of Plaintiff's intent to sell the Domain Name for a high price. Finally, Plaintiff has submitted evidence to corroborate both that he adopted Lambo as a moniker, as part of a publicly announced strategy, and that not all the domain names in his portfolio are *truly* for sale.

The Court must not weigh the evidence or determine its truth, (*Top Brand*, 2023 WL 5507825, at *3 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986))), but merely determine whether "a reasonable juror, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *James*, 636 F.Supp.2d at 965. As stated above, "[i]f the evidence yields conflicting inferences [regarding material facts], summary judgment is improper." *Collision Chiropractors*, 2022 WL 16793363, at *1. When considered in their entirety, these credible, detailed, and corroborated facts leave no doubt that there are triable issues of fact on the issue of Plaintiff's intent.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied.

DATED: June 3, 2024

By: */s/Brett E. Lewis*_____
Brett E. Lewis
**LEWIS & LIN LLC**
77 Sands Street, 6th Floor
Brooklyn, New York 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
Emails: brett@ilawco.com
        shuyu@ilawco.com

*Attorneys for Plaintiff/Counter-Defendant*

22