**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Richard Blair,

          Plaintiff,

v.

Automobili Lamborghini SpA,

          Defendant.

No. CV-22-01439-PHX-ROS

**ORDER**

    Defendant Automobili Lamborghini ("Lamborghini") manufactures cars sometimes referred to as "Lambos." Plaintiff Richard Blair is the current owner of the domain name <lambo.com> ("Disputed Domain"). Lamborghini believes it is entitled to own that domain name and an international arbitration panel agreed. Blair filed this suit seeking a judgment that he is allowed to retain ownership of <lambo.com>. Lamborghini filed a motion for summary judgment on all claims. (Doc. 56). Because Blair has failed to demonstrate genuine issues of material fact, the Court will grant Lamborghini's motion.

## BACKGROUND

    All facts set forth below are undisputed or not subject to reasonable dispute based on the parties' proffered evidence unless otherwise noted. Both Plaintiff and Defendant filed separate statements of fact in support of their positions. (*See* Doc. 57, "DSOF"; Doc. 59, "PSOF").

    Lamborghini is an Italian manufacturer of luxury sports cars. Richard Blair is an investor and developer of domain names. On January 16, 1990, Lamborghini filed an

application, Serial No. 74019105, with the United States Patent and Trademark Office ("USPTO") to register the LAMBORGHINI mark.  On November 13, 1990, the USPTO granted Lamborghini's application and the LAMBORGHINI mark received its federal registration, U.S. Registration No. 1622382.  The domain <lambo.com> was registered on March 5, 2000.  On February 16, 2018, Blair purchased the Disputed Domain for $10,000 from John Lambeth.  When Blair acquired the Disputed Domain, neither Blair nor Lamborghini had any trademark rights in the word LAMBO.[1]

On April 29, 2022, Lamborghini filed a Complaint with the World Intellectual Property Organization (WIPO) Arbitration and Mediation Center seeking a transfer of domain name under the Uniform Domain Name Dispute Resolution Policy (the "UDRP"). On August 3, 2022, the panel determined (with one dissenting panelist) the domain was "confusingly similar" to the LAMBORGHINI mark and Blair was using the mark in bad faith.  The panel ordered Blair to transfer the domain to Lamborghini.  After Lamborghini filed its WIPO complaint, Blair redirected visitors to the <lambo.com> domain to a third-party website called NamePros.com wherein Blair stated, among other things, he would "defend, defeat, and humiliate" Lamborghini, accused Lamborghini of "theft," and provided a link to the UDRP proceedings in his blog post.

Blair has listed the Disputed Domain for sale at different prices at various times as follows: August 6, 2020—$1,129,298.00; December 23, 2020—$1.5 million; January 27, 2021—$3.3 million; September 23, 2021—$12 million; August 11, 2022—€50 million; September 7, 2023 and currently—$75 million.  Blair received several offers and inquiries from others seeking to buy <lambo.com> at various different prices, but he declined them all.   Blair has not used the Disputed Domain—neither commercially nor non-commercially—and claims he purchased it because he saw <lambo.com> as a "brandable,

---

[1] According to the United States Patent and Trademark Office, Defendant Lamborghini filed an application for registration of the LAMBO mark on September 23, 2024.  *See* https://tsdr.uspto.gov/#caseNumber=98765111&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch.

pronounceable, single-word dot-com domain name" that fit with his existing portfolio of around 130 other domain names.  Blair claims he planned to "develop" the Disputed Domain but had abandoned those plans due to "limited personal capacity."  Finally, Blair claims he will seek to later resume development of the website.  Lamborghini argues Blair's ownership of the Disputed Domain violates the Anti-Cybersquatting Consumer Protection Act ("ACPA").

### LEGAL STANDARDS

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial.  *Id.*

At summary judgment, the Court considers only admissible evidence. [2]  *See* Fed. R. Civ. P. 56(c)(1)(B).  When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.  In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party.  *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

---

[2] Lamborghini objects to the admissibility of certain evidence presented by Blair, including searches of the term "Lambo" on various websites and references to Blair as "Lambo" by social media users and his family members.  This evidence does not affect the Court's decision.

To establish a cybersquatting violation under the ACPA, a mark owner must prove "(1) the [domain name owner] registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the [mark owner]; and (3) the [domain name owner] acted with bad faith intent to profit from that mark." *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (internal quotations omitted).  The ACPA lists nine non-exhaustive factors a court may consider in determining bad faith:

(I)     the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)    the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)    the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)     the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)  the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such

1

2

(IX)       domain names, without regard to the goods or services of the parties; and

the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i). The first four factors are circumstances indicating good faith use, the next four factors are circumstances indicating bad faith use, and the last factor can point in either direction. 5 McCarthy on Trademarks and Unfair Competition § 25A:53. "The most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors" enumerated by Congress. *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 946–47 (9th Cir. 2002). Moreover, evidence of bad faith may arise after the registration of the domain name. *DSPT Int'l, Inc.*, 624 F.3d at 1220. "None of the factors is individually dispositive, and they should not be added up against one another (i.e., a party 'winning' five factors does not win the argument per se)." *Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 798–99 (4th Cir. 2023).

The plain language of the ACPA requires not just proof of "bad faith" in a generalized sense. Rather, "[a] defendant is liable only where a plaintiff can establish that the defendant had a 'bad faith *intent to profit.*'" *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246 (11th Cir. 2009) (emphasis in original) (citing 15 U.S.C. § 1125(d)). "We cannot read the words 'intent to profit' out of the statute." *Id.*; *see Sporty's Farm LLC. v. Sportman's Mkt, Inc.*, 202 F.3d 489, 499 n. 13 (2d Cir. 2000) (noting "bad faith intent to profit" is a term of art in the statute and should not necessarily be equated with "bad faith" in other contexts). "Profit includes an attempt to procure an advantageous gain or return." *DSPT Int'l, Inc.*, 624 F.3d at 1221 (*quoting Coca–Cola Co. v. Purdy*, 382 F.3d 774, 786 (8th Cir. 2004)). The crucial elements of bad faith intent to profit, according to the ACPA's Senate Judiciary Committee Report, are distilled to mean an "intent to trade on the goodwill of another's mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004) (quoting S.Rep. No. 106–140, at *9).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Determining bad faith intent to profit using the nine statutory factors and the 'unique circumstances of the case' is fact dependent." *Anlin Indus., Inc. v. Burgess*, 301 F. App'x 745, 746 (9th Cir. 2008).  Because "intent is rarely discernable directly, it must typically be inferred from pertinent facts and circumstances." *Int'l Bancorp, LLC v. Societe Des Baines De Mer Et Du Cercle Des Estrangers A Monaco,* 192 F.Supp.2d 467, 486 (E.D. Va. 2002).

## ANALYSIS

Defendant Automobili Lamborghini moves for summary judgment on its cybersquatting claim under 15 U.S.C. § 1125(d).  (Doc. 56, "Mot.").  Blair concedes (i) he is the current registrant of the domain name <lambo.com>; (ii) the LAMBORGHINI mark was distinctive prior to both the initial registration of the Disputed Domain and as of the date Blair purchased the Disputed Domain; and (iii) <lambo.com> is confusingly similar to the LAMBORGHINI mark.  (Doc. 58 at 7, "Resp.").  This leaves at issue only whether Blair acted with bad faith intent to profit from the mark.  Lamborghini's motion analyzes several of the ACPA bad faith factors, arguing they are undisputed and leave no genuine issue of material fact whether Blair acted with bad faith intent to profit.  (Mot. at 7–14).  Blair's response argues disputes exist regarding his lack of bad faith that render summary judgment inappropriate.  The Court will analyze each of the nine factors and conclude that no genuine issues of material fact exist with respect to Blair's bad faith intent to profit.

### A.    Intellectual Property Rights in the Domain Name (Factor I)

Lamborghini first asserts Blair has no trademark or other intellectual property rights in <lambo.com>.  (Mot. at 7; DSOF, Ex. B).  Blair admits he has no trademark rights in the word LAMBO.  This factor clearly favors Lamborghini.  *See Sporty's Farm L.L.C.*, 202 F.3d at 498 (finding Factor I favored the mark holder where the alleged cybersquatter had no property rights in the mark at the time of registration).

### B.    Legal Name or Nickname (Factor II)

Lamborghini next asserts "Lambo" is not Blair's legal name nor a name "commonly used to identify" Blair.  (Mot. at 7).  Lamborghini offers evidence in the form of several

email exchanges where Blair and others refer to him as "Richard" or "Richard Blair." (DSOF, Exs. C, D, E, and S).  Blair argues he has used "Lambo," "Lambo.com," and "Lambodotcom" as a moniker in multiple online communities and in the field of domain name investment and development.  (Resp. at 11; PSOF ¶ 9, Exs. F–L, N).  Somewhat perplexing, Blair claims he was drawn to the name "Lambo" as a play on the word "Lamb," with an outlier generic aptitude and intelligence, hence "Lambo-O" (Resp. at 13 ¶ 38), and the name "Lambo" "resonated with him on a personal level and perfectly encapsulated his identity and ethos."  (*Id.* ¶ 37).  Lamborghini asserts Blair only began referring to himself as "Lambo" after he acquired <lambo.com> which disqualifies Blair from protection under this factor.  (Doc. 60 at 2–3, "Reply").  Lamborghini cites a legislative report and a well-known trademark law treatise as support for this contention.  *See* Reply at 2 (citing H.R.Rep. No. 106–412, at *10 ("This factor is not intended to suggest that domain name registrants may evade the application of this act by merely adopting Exxon, Ford, Bugs Bunny or other well-known marks as their nicknames.") and 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:55).

Blair argues he adopted the "Lambo" moniker before Lamborghini commenced the UDRP proceeding.  This is immaterial.  The fact that a party used the domain name as a nickname is only probative of good faith if the usage occurred prior to Plaintiff's acquisition of the domain name.  *See Sporty's Farm*, 202 F.3d at 499 (finding that although the domain name included part of Plaintiff's name, the Plaintiff-entity "did not exist at the time the domain name was registered").  To suggest otherwise would render the import of this factor meaningless.  *See* H.R.Rep. No. 106–412, at *10.  Blair fails to provide evidence that he adopted the moniker "Lambo" before purchasing the Disputed Domain. Accordingly, Factor II clearly favors Lamborghini.

### C.    Use of the Domain Name (Factors III and IV)

Lamborghini next asserts Blair has not made use of the Disputed Domain "whether that be a bona fide commercial, noncommercial, or fair use."  (Mot. at 9).  Blair fails to respond to or dispute this assertion.  Indeed, Blair never developed <lambo.com> beyond

a landing page, which, since mid-2020, has been replaced with a "For Sale" page allowing web users to purchase, or make an offer to purchase, the Disputed Domain.  This factor clearly favors Lamborghini.  *See Porsche Cars N. Am., Inc. v. Spencer*, No. CIV. S-00-471 GEB PA, 2000 WL 641209, at *4 (E.D. Cal. May 18, 2000) (finding no prior use of the domain name in connection with the bona fide offering of goods and services when the webpage at issue solicited offers to purchase the domain name).

The evidence presented with respect to Factors I through IV make clear Blair did not acquire the Disputed Domain in good faith.

### D.    Intent to Divert (Factor V)

Lamborghini asserts Blair acted with bad-faith intent when—after Lamborghini filed its UDPR Complaint—Blair redirected visitors to the <lambo.com> domain to a third-party website "where Mr. Blair disparaged Lamborghini's actions against him." (Mot. at 10).  The third-party website, NamePros.com, contained a blog post published by Plaintiff under the alias "lambo.com."  (DSOF, Ex. H).  The blog post, among other things, (1) stated "**I AM LAMBO** of LAMBO.com and I will defend, defeat and humiliate those endeavouring to steal any of my domain name brands – including my moniker," (2) accused Lamborghini of "THEFT of **my asset, nomenclature, and taxonomy** they possess ZERO rights to," (3) contained the link to the UDRP proceedings, and (4) stated "[c]ountermeasures to humiliate such endeavours are afoot.  Unlawful theft will be duly punished through legal and commensurate counter efforts including any coerced and submissive accomplices."  (*Id.*).

Blair, in response, asserts Lamborghini "misrepresents the import of Factor V, and the ACPA overall" because Lamborghini's interpretation of the factor effectively eliminates the "intent to profit" language in the "bad faith intent to profit" requirement. (Resp. at 12).  Blair argues his statements in the blog post regarding defending, defeating, and humiliating Lamborghini do not evince an intent to profit and are not emblematic of the "essence of the wrong" the ACPA was enacted to combat.  (*Id.*).

Blair's actions in diverting <lambo.com> users to his blog post are not as clearly

synonymous with bad faith intent to profit as the cases cited by Lamborghini. *Morrison & Foerster, LLP v. Wick*, 94 F. Supp. 2d 1125, 1131-32 (D. Colo. 2000) (finding when alleged cybersquatter acquired domain names identical to the marks owned by a prominent law firm and the websites contained highly offensive and derogatory content regarding the legal profession, "a user may wonder about [the law firm's] affiliation with the sites or endorsement of the sites"); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1045 (S.D. Tex. 2001) (finding when alleged cybersquatter acquired a domain name confusingly similar to the mark owned by a winery and the website contained commentary on the instant lawsuit and the unfairness of the ACPA, coupled with a strongly-worded campaign about the evils of alcohol consumption, the conduct "placed [the winery] at risk of losing business and of having its business reputation tarnished."). Both of these cases illustrate examples of highly offensive conduct, wherein the central purpose of acquiring the domain names was to harass the mark holders. That blatant harassment formed the basis of the *Wick* and *Spider Webs* decisions; Blair's conduct here does not conclusively project a primary motivation to harass Lamborghini, but rather to voice his grievances regarding the ongoing dispute.

However, the Court notes Blair's conduct in redirecting web users to his blog post while clearly painting Lamborghini in a negative light does not bolster his assertion that he acted without bad faith intent to profit. It does the opposite. Construing this factor liberally, any disparagement of a mark by an alleged cybersquatter carries inherent negative commercial consequences—especially given Blair's platform and the substantial number of views and comments received by his blog post. Thus, although Blair's behavior in response to the UDRP proceedings is not given substantial weight in this analysis, this factor marginally weighs in Lamborghini's favor.

### E.    Offers to Sell the Domain Name (Factor VI)

Lamborghini next asserts this factor weighs in its favor because Blair listed, and continues to list, the Disputed Domain at exorbitant prices with a current list price of $75 million, and he has entertained multiple offers from prospective buyers. (Mot. at 12). Blair

argues although he has received multiple inquiries from third parties seeking the asking price of <lambo.com>, he never made any attempt to negotiate a sale price with them. (Resp. at 16).  Instead, Blair directed the inquirers back to the exorbitant price(s) listed at the time and even increased the price of the Disputed Domain several times purportedly to discourage people from making offers, "as the Disputed Domain because more valuable to him as a part of his identity."  (*Id.*).

Further, Lamborghini asserts Blair, in his Amended Complaint, admitted though he initially planned on developing a website at the Disputed Domain, "those plans were subsequently delayed and abandoned."  (Doc. 21, "Compl." at 3-4).  In his affidavit, Blair states his "work and interests were scheduled to be showcased on <lambo.com>" and he completed a WordPress installation and a landing page on May 2, 2019.  (Doc. 59-1 ¶ 13).  However, he subsequently decided to focus on developing another website at <ceec.com> due to limited personal capacity, and to resume development of <lambo.com> later.  (*Id.* ¶ 14, 15).  Blair states once <ceec.com> reaches certain developmental milestones, he plans to build <lambo.com> into a blog and Ceec founder's website that "will offer tips, tricks, and inspiration to others in the Ceec community, sharing insights from my experiences and fostering a supportive environment for individuals pursuing similar endeavors."  (*Id.* ¶ 15).  Lamborghini contends Blair's statements are no more than an attempt to walk back on his prior statement that his plans to develop the Disputed Domain were "abandoned" in order "to manufacture a dispute of fact regarding his intentions with the <lambo.com> domain."  (Reply at 6-7).

Blair has not offered a credible response to substantiate his claim that he intends to make legitimate use of the Disputed Domain.  He has owned <lambo.com> for over six years, and over the course of his ownership, has made no bona fide use of the website.  In fact, since mid-2020, the Disputed Domain has platformed a "For Sale" page.  Blair asserts he listed <lambo.com> for sale at an "unreasonably high price … to discourage prospective purchasers."  (Resp. at 15).  An offer to sell an item necessarily requires an intention to sell that item.  To contend otherwise would defy all common sense and well-settled principles

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of law.  Blair provides no explanation as to how listing the Disputed Domain for sale discourages prospective purchasers.  Not only did he receive numerous inquiries and offers to purchase the Disputed Domain, but he responded to and engaged with these prospective purchasers.  If <lambo.com> was truly "valuable to him as part of his identity," (*Id.* at 16) and he intended to "resume development of <lambo.com> at a later date," (*Id.* at 14) the (seventy-five) million-dollar question is why Blair would offer it for sale in the first place—let alone consistently over the past four years.

Further, Blair asserts he did not register <lambo.com> with the intent to sell it to Lamborghini, nor has he ever offered to sell the Disputed Domain to Lamborghini. However, an explicit offer to sell to the mark owner is not required.  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1221 (9th Cir. 2010).  As an experienced domain name investor, Blair would know better than to directly extort Lamborghini.  His conduct is indirectly extortionate because Lamborghini would have no other way to acquire the Disputed Domain besides forking over $75 million—or whatever ludicrous amount Blair decided on at any given day.  Blair indisputably offered to sell the Disputed Domain—without any genuine intent to use it—for his own financial gain.  This factor clearly favors Lamborghini. *See Prudential Ins. Co. of Am. v. PRU.COM*, 546 F. Supp. 3d 476, 490 (E.D. Va. 2021), *aff'd sub nom. Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785 (4th Cir. 2023) (finding Factor VI weighed in favor of mark owner when alleged cybersquatter "used the domain name to procure a six figure sum"); *cf. Lamparello v. Falwell*, 420 F.3d 309, 321-22 (4th Cir. 2005) (finding Factor VI weighed in favor of alleged cybersquatter where he used the domain name to engage in permissible "comment and criticism" and never attempted to transfer it "for valuable consideration").

###    F.    Misleading Contact Information (Factor VII)

Blair asserts he did not provide false contact information for his acquisition and management of the Disputed Domain, nor did he fail to maintain accurate contact information.  (Resp. at 18).  Lamborghini does not respond to or dispute this assertion. This factor favors Blair.

### G.    History of Cybersquatting (Factor VIII)

Blair further asserts he does not have a history of cybersquatting because he has invested in domain names since 2009 and maintains a portfolio of around 130 domain names, several of which he has developed, and none of which infringe upon the marks of others.  (Resp. at 18; PSOF, Exs. A-1, B).  Blair's domain name portfolio includes two categories of name types: (1) short domain names consisting of a randomized combination of letters and numbers, such as <11215.com>, <wywy.com>, <ceec.com>, and <nyip.com>; and (2) names consisting of combinations of commonly used words, such as <AsbestosLitigation.com>,    <CigarRoller.com>,    <ComputerCase.com>,    and <InternetFilter.com>.  (*Id.*).  Blair asserts he "conscientiously avoids targeting established trademarks before he acquires a domain name." (*Id.* at 4).  Moreover, prior to this dispute, Blair has never been accused of cybersquatting, been a party to a UDPR proceeding, or been a party to an action under the ACPA.  (*Id.*).

Lamborghini disputes Blair's contention that none of the domain names in his portfolio infringe upon the marks of others, arguing at least two of the domain names owned by Blair are trademarked word marks not owned by Blair: DNAS and PHARMACORE.  (Doc. 60, "Reply" at 9).  Blair provides a list of the domain names he owned or owns, along with the dates of purchase and/or sale, and the purchase or sale prices.  (PSOF, Exs. A-1, B).  Lamborghini provides the registration information for the trademarked word marks DNAS and PHARMACORE.  (Reply, Exs. 1, 2).  The registration date of the DNAS mark is listed as May 4, 2021.  (*Id.* at Ex. 2).  Blair's purchase of <dnas.com> on June 2, 2018, however, predated the mark's registration.  (PSOF, Ex. A). Thus, this example does not support cybersquatting because the trademark did not exist "at the time of registration" of <dnas.com>.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).  Although the PHARMACORE mark was registered on May 18, 2004 (Reply, Ex. 2), the record does not contain acquisition information for <pharmacore.com>, such as the date of purchaser and the vendor, which is essential in determining Blair's intent.  Moreover, there is no evidence to support a finding that the PHARMACORE mark is "distinctive" or "famous"

as stated in factor eight and that Blair's acquisition of <pharmacore.com> was made with bad faith intent to profit. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII).

The Court notes is it significant that Blair has engaged in the business of acquiring, developing, investing in, and selling domain names for 15 years. (PSOF, Ex. A ¶ 1). "The ACPA was not enacted to put an end to the sale of all domain names." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001); *see also* 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:61 ("[T]he mere registration of multiple domain names for resale does not per se mark one as a cybersquatter. One may be in a justifiable business of reserving many domain names."). However, that Blair does not have a history of cybersquatting is not in itself enough to absolve him of an ill-intent to profit from Lamborghini's mark. Nevertheless, this factor weighs in Blair's favor.

## H.    Distinctive and Famous Mark (Factor IX)

The final bad faith intent to profit factor "simply directs the court's attention to the strength of the [senior] mark." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25A:62 ("[The] more distinctive the senior mark, the greater the chance that there will be a likelihood of confusion."). Blair argues this factor weighs in his favor because "Lambo" is not distinctive and "not exclusively used by the public as a shorthand for Lamborghini." (Resp. at 9). However, this factor refers to the distinctiveness and famousness of the *senior* mark, i.e., LAMBORGHINI, not LAMBO. 15 U.S.C. § 1125(d)(1)(B)(i)(IX); *see* H.R. Rep. No. 106-412, at *13 (October 25, 1999) ("The more distinctive or famous a mark has become, the more likely the owner of that mark is deserving of the relief available under this act.").

Blair admits "[t]he LAMBORGHINI mark was distinctive prior to both the initial registration of the domain name and as of the date Blair purchased the domain name" and "<lambo.com> is confusingly similar to the LAMBORGHINI mark." (Resp. at 7). There is no doubt the LAMBORGHINI mark is distinctive and famous as defined in 15 U.S.C. § 1125(c)—as Blair concedes—because it is widely recognized by the general public in association with the world-famous automobiles it manufactures. This factor clearly favors

Lamborghini.

The evidence presented with respect to Factors V through IX, on balance, indisputably shows Blair evinces a bad faith intent to profit from the Disputed Domain.

**CONCLUSION**

"The ACPA allows a court to view the totality of the circumstances in making the bad faith determination." *Virtual Works*, 238 F.3d at 270.  The only two factors weighing in Blair's favor—Factors VII and VIII—do not overcome the strength of the remaining factors supporting his bad faith intent to profit from the Disputed Domain.  While it may be true that (1) Blair initially acquired <lambo.com> for bona fide reasons to expand his domain name portfolio and eventually develop the website into a blog and (2) he has no prior history of cybersquatting, the conclusion of any reasonable factfinder can only be that Blair's actions with respect to the Disputed Domain to date were made with a bad faith intent to profit from the goodwill of Lamborghini.

Blair has no legal rights in the mark LAMBO.  He only began adopting the moniker "Lambo" after acquiring the Disputed Domain.  He has made no bona fide use of the Disputed Domain.  Blair disparaged Lamborghini by redirecting <lambo.com> users to a blog post where he threatened to "humiliate" Lamborghini following its success in the UDRP proceedings.  Since as early as mid-2020, Blair has listed the Disputed Domain for sale at exorbitant sums.  Its current list price of $75 million marks a 749,900% increase from the price for which Blair purchased <lambo.com>.  Blair claims he intends to develop <lambo.com> into a personal blog at an unspecified point in time, without presenting any concrete plans to do so.

Moreover, LAMBORGHINI is a highly famous and distinctive mark, and Blair concedes LAMBO is confusingly similar to it.  The Court notes the general public may not exclusively associate LAMBO with LAMBORGHINI.  However, it is obvious the public's strong association of LAMBO with LAMBORGHINI is the most enticing reason for a prospective buyer's acquisition of the Disputed Domain.  Profiteering on the goodwill of another's mark is exactly what the ACPA intended to prevent.  *See Lucas Nursery &*

*Landscaping, Inc.*, 359 F.3d at 810 (citing S.Rep. No. 106–140, at *9).  The sole reasonable inference from the facts and circumstances presented is that Blair acted with bad faith intent to profit from the LAMBORGHINI mark.  Based on the totality of the circumstances and the admissible evidence presented, the Court finds there are no genuine disputes of material fact with respect to the cybersquatting claim.  Therefore, the Court grants Lamborghini's motion.   Because Blair's claims for injunctive relief under the ACPA necessarily fail, Blair's Complaint is dismissed with prejudice.

Accordingly,

**IT IS ORDERED** Defendant's motion for summary judgment (Doc. 56) is **GRANTED**.  Plaintiff's Complaint is dismissed in its entirety with prejudice.  The Clerk of Court is directed to enter judgment in favor of Defendant against Plaintiff and close this case.

Dated this 16th day of October, 2024.

Honorable Roslyn O. Silver
Senior United States District Judge